**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

QUENTIN SIMMONS,

        Petitioner,

v.                                                 Case No. 3:15-cv-35-J-32PDB

SECRETARY OF THE FLORIDA
DEPARTMENT OF CORRECTIONS and
FLORIDA ATTORNEY GENERAL,

        Respondents.

_____

## ORDER

### I.  Status

Petitioner, an inmate of the Florida penal system, initiated this case by filing a pro se

Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1). He subsequently

obtained counsel and is currently proceeding on a Second Amended Petition (Doc. 22) that

includes a supporting Memorandum of Law and Fact (Doc. 22-1). Petitioner challenges his

2007 state court (Duval County) judgment of conviction for first degree murder, for which he

is serving life imprisonment. Respondents filed an Answer (Doc. 28) including exhibits (Ex.).

Petitioner, through counsel, filed a Reply (Doc. 31). The case is ripe for review.[1]

_____

[1] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need
for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th
Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011)).
"In deciding whether to grant an evidentiary hearing, a federal court must consider whether
such a hearing could enable an applicant to prove the petition's factual allegations, which,
if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S.
465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual
allegations or otherwise precludes habeas relief, a district court is not required to hold an
evidentiary hearing." Id. The pertinent facts of this case are fully developed in the record

## II.  Governing Legal Principles

### A.  Standard of Review

The Antiterrorism and Effective Death Penalty Act (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), cert. denied, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

> Under AEDPA, when a state court has adjudicated the petitioner's claim on the merits, a federal court may not grant habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). A state court's factual findings are presumed correct unless rebutted by clear and convincing evidence.[] Id. § 2254(e)(1); Ferrell v. Hall, 640 F.3d 1199, 1223 (11th Cir. 2011).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has

---

before the Court, and "further factual development" is not necessary. Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

"[A] federal court reviewing the judgment of a state court must first identify the last adjudication on the merits. It does not matter whether that adjudication provided a reasoned opinion because section 2254(d) 'refers only to a decision' and does not 'requir[e] a statement of reasons.'" Wilson v. Warden, Ga. Diagnostic Prison, 834 F.3d 1227, 1235 (11th Cir. 2016) (quoting Richter, 562 U.S. at 98), cert. granted, 137 S. Ct. 1203 (2017). Regardless of whether the last state court provided a reasoned opinion, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99 (citation omitted). When the last adjudication on the merits "'is unaccompanied by an explanation,' a petitioner's burden under section 2254(d) is to 'show[] there was no reasonable basis for the state court to deny relief.'" Wilson, 834 F.3d at 1235 (quoting Richter, 562 U.S. at 98). "'[A] habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the] Court.'" Id. (quoting Richter, 562 U.S. at 102).

> When the reasoning of the state trial court was reasonable, there is necessarily at least one reasonable basis on which the state supreme court could have denied relief and our inquiry ends. In this way, federal courts can use previous opinions as evidence that the relevant state court decision under review is reasonable. But the relevant state court decision for federal habeas review remains the last adjudication on the merits, and federal courts are not limited to assessing the reasoning of the lower court.

Id. at 1239.[2]

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before filing a habeas petition in federal court, a petitioner must exhaust all available state court remedies. To exhaust state remedies, the petitioner must "fairly present[]" each issue raised in his federal petition to the state's highest court. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). This means that a "state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); Raleigh v. Sec'y, Fla. Dep't of Corr., 827 F.3d 938, 956 (11th Cir. 2016), cert. denied, Raleigh v. Jones, 137 S. Ct. 2160 (2017) ("The petitioner must have presented the claim in a manner that affords the State a full and fair opportunity to address and resolve the claim on the merits." (quotations and citation omitted)). It is not "sufficient merely that the federal habeas petitioner has been through the state courts, nor is it sufficient that all the facts necessary to support the claim were before the state courts or that a somewhat similar state-law claim was made." Preston v. Sec'y, Fla. Dep't of Corr.,

---

[2] Wilson is currently before the Supreme Court. However, even under pre-Wilson AEDPA jurisprudence, the result here would be the same.

785 F.3d 449, 457 (11th Cir. 2015). Rather, "[t]he crux of the exhaustion requirement is simply that the petitioner must have put the state court on notice that he intended to raise a federal claim." Id.

Failure to exhaust results in a procedural default which raises a potential bar to federal habeas review. "A state prisoner may overcome the prohibition on reviewing procedurally defaulted claims if he can show 'cause' to excuse his failure to comply with the state procedural rule and 'actual prejudice resulting from the alleged constitutional violation.'" Davila v. Davis, 137 S. Ct. 2058, 2064-65 (2017) (citing Wainwright v. Sykes, 433 U.S. 72, 84 (1977); Coleman v. Thompson, 501 U.S. 722, 750 (1991)). To show cause for a procedural default, "the petitioner must demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). "[T]o show prejudice, a petitioner must demonstrate that 'the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness.'" Id. (quoting McCoy v. Newsome, 953 F.2d 1252, 1261 (11th Cir. 1992) (per curiam)).

A petitioner may also obtain review of a federal habeas claim that is procedurally defaulted if he can show that a fundamental miscarriage of justice has occurred; meaning that a "constitutional violation has probably resulted in the conviction of one who is actually innocent[.]" Murray, 477 U.S. at 496. Actual innocence means factual innocence, not legal insufficiency. Bousley v. United States, 523 U.S. 614, 623 (1998). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. Schlup v. Delo, 513 U.S. 298, 327 (1995). "To be

credible, a claim of actual innocence must be based on [new] reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324).

### C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [Strickland,] 466 U.S. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id. at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687.[]

> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

Richter, 562 U.S. at 104; Marshall, 828 F.3d at 1284 (recognizing that to proceed on a claim of ineffective assistance of trial counsel, "the petitioner has to show both that his counsel's

6

performance was deficient and that that deficient performance was prejudicial—that is, that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (quoting <u>Strickland</u>, 466 U.S. at 687, 694)). Since both prongs of the two-part <u>Strickland</u> "test must be satisfied to show a Sixth Amendment violation, a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." <u>Ward v. Hall</u>, 592 F.3d 1144, 1163 (11th Cir. 2010) (citing <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000)).

"'The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.'" <u>Marshall</u>, 828 F.3d at 1285 (quoting <u>Overstreet v. Warden</u>, 811 F.3d 1283, 1287 (11th Cir. 2016)).

> "The question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at 86.

<u>Hittson v. GDCP Warden</u>, 759 F.3d 1210, 1248 (11th Cir. 2014).

### III.  Analysis

#### A.  Ground 1(A)

Petitioner argues that his trial "counsel was ineffective for failing to investigate and properly argue against the false evidence in the affidavit for the search warrant and in conceding to the facts in the search warrant." Second Amended Petition at 6 (capitalization and emphasis omitted). Respondents contend that this claim is procedurally barred, and this Court agrees.

Petitioner did not present this claim in his initial Rule 3.850 motion as an ineffectiveness claim; rather, he presented it as a trial court error claim. Ex. I at 3-7. Before the state court ruled on the motion, Petitioner filed a motion for leave to amend recognizing "that he inadvertently included claims of trial court errors that are not cognizable under Rule 3.850" and he requested leave "to add additional claims related to the ineffectiveness of trial counsel." Id. at 24. The court granted his request, id. at 27-28, and he filed an amended Rule 3.850 motion raising two ineffective assistance of trial counsel claims–neither of which related to the search warrant affidavit or the motion to suppress. Id. at 29-33. After holding an evidentiary hearing on one of Petitioner's claims, the postconviction court entered an order acknowledging that the trial court error claim regarding the search warrant affidavit was not cognizable in a Rule 3.850 proceeding. Id. at 52-53.

Petitioner appealed, and raised one issue: "Trial court abused it's [sic] discretion when it denied Defendant's motion, and multiple oral request[s] for appointment of 3.850 counsel." Ex. J. at 4 (some capitalization omitted). Petitioner's substantive argument focused on the postconviction court's denial of his requests for counsel. See id. at 4-8. The state responded on the merits, arguing that the postconviction court did not abuse its discretion in denying Petitioner's requests for counsel. Ex. K. The First District Court of Appeal (DCA) entered a per curiam affirmance without issuing a written opinion, Ex. L, and subsequently denied Petitioner's motion for rehearing, Ex. O.

Petitioner filed a second or successive Rule 3.850 motion, in which he argued that his counsel was ineffective for conceding at the suppression hearing that only the killer and law enforcement would have known that the victim had been covered in household cleaner. Ex.

P. The postconviction court found the motion to be untimely filed, but then denied the claim

on the merits. Ex. Q.

> Even if Defendant filed the instant Motion within two years of his judgment and sentence becoming final, his claim would fail. In his original Motion for Postconviction Relief, Defendant included a ground contending the detective investigating the crime "entered false statements in his affidavit for the search warrant." The Court dismissed this ground because it was not cognizable in a rule 3.850 motion. Defendant now raises the same issue as one of ineffective assistance of counsel.

> . . . .

> Defendant asserts counsel was ineffective for conceding to an integral fact at the Motion to Suppress hearing held on June 4, 2007. According to Defendant, the search warrant was based on a detective's "material false statement" that the victim's body smelled as if it had been washed with a household cleaner.[] Defendant contends the detective included that fact only to corroborate Linette Resto's statement to the police and when counsel conceded to that statement he "disadvocated the Defendant's cause."

> Resto, Defendant's former girlfriend, testified at trial that Defendant told her he "slit [the victim's] throat, and that he cut out eyeballs and that he moved her body and he poured Clorox and Pinesol on her." Detective Warkentien testified the fact that the victim's clothes smelled like Pinesol was not made public.

> At the suppression hearing, counsel told the Court the affidavit for the search warrant contained information that Resto "knew . . . the victim was covered with household cleaner." Counsel went on to say, "the only fact that [Resto] reported which was unknown to the general public was the household cleaner. And I agree with that because we have not been able to find anybody else who knew that."[]

> It was reasonable for counsel to concede to the fact that no one else knew the victim's clothes smelled like household cleaner when the detectives did not make this fact public and when Resto expressed knowledge of that fact. See Strickland,

466 U.S. at 689 (finding strong presumption counsel's performance "falls within the wide range of reasonable professional assistance"). Here, Defendant merely speculates that because "no one who came in contact with the victim while she was still alive, or deceased, mentioned that the victim smelled of a cleaning solution[,]" then these individuals did not detect the odor of household cleaner. Defendant's Motion lacks specific examples, necessary detail, or appropriate supporting documentation. See id. at 690 (explaining ineffective assistance claim must identify with specificity acts or omissions defendant alleges to be outside range of professional conduct). So, even if the Court finds–and it does not–counsel acted unreasonably, Defendant does not show how this prejudiced the outcome of the proceedings.

Id. at 2-4 (footnote and citations omitted). The court also recognized that counsel argued at the suppression hearing "that relying on Resto's comment was not enough to find probable cause," because the search warrant affidavit failed to contain any information "'about her credibility, so the credibility determination would have to be made entirely on'" the fact regarding the household cleaner. Id. at 3 n.1 (quoting Ex. A at 142). The court's order specifically advised Petitioner that he had thirty days to file a notice of appeal, but he did not do so. Id. at 4.

Because Petitioner did not raise this claim in his initial Rule 3.850 proceeding and he did not file an appeal in his second Rule 3.850 proceeding,[3] he failed to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan, 526 U.S. at 845. He cannot

---

[3] Petitioner's argument that he would have been subjected to sanctions had he filed an appeal in his second or successive Rule 3.850 proceeding is not compelling. See Reply at 3-5. The postconviction court addressed the claim on the merits and specifically advised Petitioner that he had 30 days in which to file an appeal. Ex. Q at 4.

now return to state court and properly exhaust this claim; thus, the claim is procedurally

barred on federal habeas review.

Petitioner argues that <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012), excuses the procedural

bar and permits this Court to hear the claim on the merits.

> In <u>Martinez</u>, the U.S. Supreme Court enunciated a narrow exception to the general rule that the lack of an attorney or attorney error in state post-conviction proceedings does not establish cause to excuse the procedural default of a substantive claim. The Supreme Court, however, set strict parameters on the application of this exception. It applies only where (1) state law requires a prisoner to raise ineffective-trial-counsel claims during an initial collateral proceeding and precludes those claims during direct appeal; (2) the prisoner failed to properly raise ineffective-trial-counsel claims during the initial collateral proceeding; (3) the prisoner either did not have counsel or his counsel was ineffective during those initial state collateral proceedings; and (4) failing to excuse the prisoner's procedural default would result in the loss of a "substantial" ineffective-trial-counsel claim.

<u>Lambrix v. Sec'y, Fla. Dep't of Corr.</u>, 851 F.3d 1158, 1164 (11th Cir. 2017), <u>cert.</u> <u>denied</u>, 138

S. Ct. 217 (2017) (citations omitted); <u>see</u> <u>Luciano v. Sec'y, Dep't of Corr.</u>, 701 F. App'x 792,

793 (11th Cir. 2017); <u>Sullivan v. Sec'y, Fla. Dep't of Corr.</u>, 837 F.3d 1195, 1201 (11th Cir.

2016). The Supreme Court expressly limited its holding:

> The rule of <u>Coleman</u> governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons.

<u>Martinez</u>, 566 U.S. at 16.

Assuming <u>Martinez</u> applies, the Court finds that Petitioner has failed to show this is a "substantial" claim, because as explained below, the claim is without merit.[4]

In the Second Amended Petition, Petitioner argues that counsel was ineffective for conceding at the suppression hearing that Ms. Resto (the witness on whose statement the search warrant affidavit was based) knew about a fact (the victim was covered in household cleaner) that only the killer and law enforcement would have known, and for failing "to argue that several relevant facts were omitted from the affidavit and several facts contained within the affidavit were misstatements."[5] Second Amended Petition at 9-10.

Before trial, Petitioner's counsel filed a motion to suppress the DNA swabs and resulting DNA evidence. Ex. A at 37-39. He argued:

> 1. On March 23, 2006, Quentin Simmons was transported from the jail to the Homicide section of the Police Memorial Building where he was interviewed by Detectives Warkent[ie]n, Durfee and Dingee about a homicide that had occurred on March 7, 2005. At the time of this interview Mr. Simmons was in jail on an unrelated charge.

---

[4] It is questionable whether the narrow, equitable exception announced in <u>Martinez</u> actually applies in this instance. By Petitioner's own concession, he knew of this ineffectiveness claim during his initial Rule 3.850 proceeding but chose not to raise it because a jailhouse lawyer told him it was not a good claim. Ex. P (Petitioner's affidavit submitted with his second or successive Rule 3.850 motion); <u>cf.</u> Ex. I at 140 (discussion between the postconviction court and Petitioner at the evidentiary hearing regarding Petitioner's ability to write a "very clear and very factual and very detailed" motion). And, the state court ultimately ruled on the merits of this claim in Petitioner's second Rule 3.850 proceeding (and specifically advised Petitioner that he had thirty days in which to file an appeal, but he did not do so). Ex. Q. Thus, Petitioner could have, and eventually did, raise this claim in a Rule 3.850 proceeding, and the state postconviction court addressed the claim on the merits. Nevertheless, for purposes of completeness on federal habeas review, this Court will assume that <u>Martinez</u> applies.

[5] In state court, Petitioner only argued counsel was ineffective when he conceded the fact about the household cleaner. Ex. P.

2.      During the interview Mr. Simmons denied being involved in the homicide and denied telling his girlfriend, Linette Resto, anything about the murder.

3.      After talking for a while Mr. Simmons invoked his right to remain silent and also refused to give his consent to cheek swabs for DNA.

4.      Detective Warkent[ie]n then held Mr. Simmons in the interview room while he prepared an Affidavit for Search Warrant and presented the Affidavit to Honorable Hugh A. Carithers who thereafter issued a Search Warrant.

5.      Detective Warkentien returned to the Police Memorial Building with the Search Warrant and read it to Mr. Simmons in the interview room. After he read the Warrant he obtained the cheek swabs.

6.      The cheek swabs were tested in a lab and revealed evidence which the State intends to use against Mr. Simmons.

7.      The Affidavit for the Search Warrant omits the material fact that Mr. Simmons had just been interviewed and had denied involvement in the murder and had denied making the statements to Linette Resto which are recited in the Affidavit.

8.      The Affidavit for a Search Warrant recites: "Some of the information that Ms. Resto provided was known only to the killer and to law enforcement. Ms. Resto knew that the victim had a child, that the victim's name was 'Jamie', that the victim was still alive when she was found, that the victim's eyes were cut, that the victim was covered in a household cleaner, that the incident involved sex, and that the killer used a condom. Knowledge of these unpublished details of this crime corroborates Ms. Resto's statement and makes Ms. Resto's statement credible and reliable." This statement in the Affidavit is misleading, either intentionally so or with reckless disregard for the truth. In fact, many people knew that the victim had a child and that her name was Jamie. Her name was widely reported in the news. The people at the scene and others not at the scene knew the victim was still alive when she was found. A rescue vehicle and helicopter, not the Medical

Examiner's vehicle, picked her up from the scene and removed her quickly for treatment. The news reported that she was suffering life-threatening injuries when she was found and she died later at the hospital. The fact that the victim's eyes were cut was generally known in the Mayport community by people who knew of the victim. That the incident involved sex and that the killer used a condom have never been conclusively established as true, but it was reported in the media that the victim was a prostitute in the Mayport area. The condom that was found was found by teachers or students in a parking lot of the school away from where the body was found, and that condom has never been connected with the death of the victim. It appears that the only information recited above which had not gotten out to the general public was that the victim was covered with a household cleaner.

9.      When the omission is added to the Affidavit and the misstatements are removed, there is no longer probable cause for the issuance of the Search Warrant. The fruits of that warrant, including the swabs and the DNA tests, should therefore be suppressed.

Id. (emphasis added). The trial court held a hearing on the motion to suppress, during which it watched a videotaped interview of Petitioner prior to his arrest in this case; received into evidence pertinent portions of Detective Warkentien's deposition, the detective who applied for the search warrant at issue; and heard argument from counsel. Id. at 91-147.[6] Petitioner's counsel argued at the suppression hearing:

[T]he way the affidavit was presented to Your Honor, to the neutral magistrate, one could conclude that Mr. Simmons and Linette Resto were still dating and that there were a number of unpublished details related by Mr. Simmons to her that enhanced her credibility, that she knew the victim's name, that she knew the victim had a son, that she was alive when found, her eyes had been cut, the incident involved sex, the

_____

[6] Petitioner filed two motions to suppress in the trial court and the evidentiary hearing was held on both motions. Ex. A at 33-35, 37-39, 91-147. At issue here is the motion to suppress physical evidence, which included DNA swabs and resulting DNA evidence. Id. at 37-39.

killer used a condom, and the victim was covered with a household cleaner. But, in fact, the truth was that there were broken up at the time she informed against him, and the only fact that she related which was unknown to the general public was the household cleaner. And I agree with that because we have not been able to find anybody else who knew that.

. . . .

And the State would argue that reliability is shown entirely by the fact that she knew Mr. Simmons and that she knew this fact about the household bleach. But there's nothing else in here at all about her credibility, so the credibility determination would have to be made entirely on - - on that fact.

We don't know from this affidavit anything about her criminal record, her employment record. There's no description of kind of her place or her standing in the community, her age, her education, her intelligence, even her address, how long the interview went on, or whether the detective himself found her credible. Nothing at all. . . . [T]he only thing we know about her credibility is her claim that she dated him at some time and that she no longer does. Although we don't know from the affidavit, just that she dated him at some time and that she knows this fact about the victim being covered with household cleaner. And I suggest that that's just not enough.

Ex. A at 140-42. On the record, the trial court denied the motion to suppress physical evidence: "I am entering an order denying the motion to suppress physical evidence finding that probable cause still existed without the alleged misstatements and with the omissions in the affidavit." Id. at 143. The judge subsequently entered a written order to that effect. Id. at 40 (citing Thorp v. State, 777 So. 2d 385 (Fla. 2000)).

This Court initially notes that Petitioner's trial counsel did address some of the alleged "omitted facts" and "misstatements." For example, Petitioner claims that counsel should have

15

argued that "the victim was well known in the community and the fact that she was found alive was reported in the news." Second Amended Petition at 9. Counsel did:

> In fact, many people knew that the victim had a child and that her name was Jamie. Her name was widely reported in the news. The people at the scene and others not at the scene knew the victim was still alive when she was found. A rescue vehicle and helicopter, not the Medical Examiner's vehicle, picked her up from the scene and removed her quickly for treatment. The news reported that she was suffering life-threatening injuries when she was found and she died later at the hospital.

Ex. A at 38-39. As another example, Petitioner asserts that counsel should have pointed out this alleged "misstatement" in the search warrant affidavit: "[A] used condom was found on school grounds in the vicinity of the victim's body." Second Amended Petition at 10. Counsel did: "The condom that was found was found by teachers or students <u>in a parking lot of the school away from where the body was found</u>, and that condom has never been connected with the death of the victim." Ex. A at 39 (emphasis added).

Additionally, Petitioner asserts that the search warrant affidavit stated that the victim's "body smelled as if it had been washed with a household cleaner," when the information Detective Warkentien received from the other detective was that her <u>clothes</u> smelled like Pine-Sol, and Ms. Resto told Detective Warkentien that Petitioner told her that he had poured a mixture of Pine Sol and bleach on the victim's body. Second Amended Petition at 7-9. Detective Warkentien testified at a deposition before the suppression hearing:

> Q. . . . [O]f the information that she had from him, was there any of that that you had not heard from somebody else . . . in all of your investigations talking to all of those folks out on Mayport Road?
>
> A.      Yes, there was. . . . The Pine-Sol.

Q.     Okay. Nobody else in the investigation had mentioned that?

A.     No. The only time that that was brought out, the very first morning whenever Detective[s] Waldrup and Durfee went to the hospital to get her clothes to put in the property room, Detective . . . Durfee or Waldrup . . . called me . . . on my cell phone and said, hey, we got the clothes and it smelled like Pine-Sol. . . . I said, well, could you ask the hospital to see if there's something? They checked with them. The hospital doesn't use Pine-Sol or anything to do any cleaning. So we basically just ran in a dead end. Where could that come from? And that was totally forgotten about, never brought up ever again.

Q.     And no news media knew anything about that as far as you knew?

A.     No. No.

Q.     And none of the witnesses you ever talked to said anything about that that you know about?

A.     No. Because that was something that no one knew. And whenever Lynette came to us and said that, that's when we knew, whoa, because that's the first time we'd heard about it since that very first morning.

Doc. 10-2 at 66.[7] Because the victim's clothes were located on or around her body, counsel could have reasonably concluded that this was a distinction without a difference and made this concession as part of a sound strategy based on the information he had at that time.[8] There is no indication in the record that Detective Warkentein deliberately or with reckless

---

[7] A copy of the Detective's deposition is attached to Petitioner's memorandum in support of his first amended petition.

[8] The postconviction court found in Petitioner's second Rule 3.850 proceeding that "[i]t was reasonable for counsel to concede to the fact that no one else knew the victim's clothes smelled like household cleaner . . . ." Ex Q at 3.

disregard included false facts in the search warrant affidavit. Counsel's actions were not objectively unreasonable.

The record, including the transcripts of the suppression hearing and the trial, reflects that Petitioner's counsel effectively represented him. Considering the record, and applying a "strong presumption" that counsel's representation was within the wide range of reasonable professional assistance, this Court finds Petitioner has not shown that his counsel was deficient in presenting and arguing the motion to suppress. Because this claim lacks merit, it is not a "substantial" claim warranting application of the <u>Martinez</u> exception. Petitioner has not shown both cause excusing the default and actual prejudice resulting from the bar. Nor has he shown that he is entitled to the fundamental miscarriage of justice exception. Accordingly, Petitioner is not entitled to federal habeas relief on Ground 1(A).

**B. Ground 1(B)**

Petitioner argues that his trial counsel was ineffective for misadvising Petitioner regarding his right to testify. Second Amended Petition at 11-13. Petitioner raised this claim in his initial Rule 3.850 proceeding. Ex. I at 30-32. The postconviction court held an evidentiary hearing on this claim, at which Petitioner represented himself.[9] <u>Id.</u> at 133-54. Petitioner's trial counsel, Alan Chipperfield, Esquire, testified.[10] <u>Id.</u> at 138-51.

> [STATE]: So, Mr. Chipperfield, if you could tell the Court how you advised Mr. Simmons with regard to his right to testify.

---

[9] Although Petitioner filed a motion requesting that counsel be appointed to represent him at the evidentiary hearing, Ex. I at 44-45, the court denied his request, <u>id.</u> at 47, 133-35; <u>see also</u> <u>id.</u> at 149-53.

[10] At the time of Petitioner's trial, Mr. Chipperfield had been representing defendants in first degree murder cases for approximately 25 years. <u>See</u> Ex. I at 144-45

[MR. CHIPPERFIELD]: . . . Let me first say that the way I read his motion, it's slightly different at Page 2 and Page 5. On Page 2 he's alleged that I told him that the judge would instruct the jury to disregard his testimony. At Page 6 it's worded slightly different; it says that I instructed - - I told him that the judge himself would rule the testimony inadmissible. I didn't say either of those to Mr. Simmons. I explained to him that every witness who testified is subject to impeachment and subject to the rules that determine credibility and that those rules would apply to him, like any other witness.

I did look back in my notes to try to find out if there was something that Mr. Simmons might have misunderstood about that, and I found two places in my notes in the months before trial, just a few months before trial where I - - with regard to Linette, who was a very important witness against him, he thought that her testimony should be excluded because she had lied to the police and some of her statements were inconsistent, and I explained to him that at that time, and my notes reflect this, that a witness doesn't get excluded just because she has given inconsistent statements, that it's up to the jury . . . to weigh the credibility after the witness is impeached.

We had the same discussion with regard to the DNA analyst, just two months after the discussion of Linette, it was the same issue, and I - - I can interpret from that Mr. Simmons - - I'm not sure whether that's the source of these allegations or not, but he, at that time, had some misunderstanding about how witnesses were treated when they told inconsistent statements, and I straightened that out with him on two occasions prior to trial.

[STATE]: Okay. Did you have specific discussions with Mr. Simmons about what his testimony would be if called as a witness?

[MR. CHIPPERFIELD]: Well, yeah. . . . I talked with him many times about what he knew about this offense.

[STATE]: And was that testimony consistent with his prior statements to police?

[MR. CHIPPERFIELD]: At times.

[STATE]: Okay. So he gave you different versions about what his testimony would be if he chose to take the witness stand?

[MR. CHIPPERFIELD]: Yes.

[STATE]: Okay. Did you advise in any way that Mr. Simmons should not take the witness stand because it would not be in his interest to do so?

[MR. CHIPPERFIELD]: No. I looked through my notes for that, and I don't remember Mr. Simmons ever telling me he wanted to testify . . . and I did not try to dissuade him from testifying at any time.

. . . .

[STATE]: . . . [W]as this a strong case for the State of Florida, meaning there was a lot of evidence against Mr. Simmons?

[MR. CHIPPERFIELD]: Yes, I thought so.

[STATE]: And that was based upon Mr. Simmons' girlfriend's testimony that he confessed to the crime?

[MR. CHIPPERFIELD]: That was - - she was the main witness against him, yes, and that's what she said.

[STATE]: And Mr. Simmons' girlfriend, you mentioned her name earlier, Linette Resto, she knew details that were not known publicly?

[MR. CHIPPERFIELD]: Yes, she did.

[STATE]: And in addition to Ms. Resto's testimony, Mr. Simmons was facing forensic evidence, specifically that his DNA was found right above the victim's body in a bloody fingerprint?

[MR. CHIPPERFIELD]: That's correct.

[STATE]: And although that fingerprint had ridged detail, it could not - - it was not a print of value.

[MR. CHIPPERFIELD]: That's the way I remember it. The DNA was of value, but the print itself was not, for fingerprint purposes.

Id. at 142-46. Petitioner was then given a chance to ask Mr. Chipperfield questions, but he refused to do so without having counsel present. The court explained to Petitioner that this would be his only opportunity to ask Mr. Chipperfield questions to support the arguments in his motion. See id. at 146-51. Petitioner declined to ask any questions. See id. at 151.

THE DEFENDANT: Well, Judge, I really have no questions to ask him at this time, but as I alleged in my motion, he specifically advised, persuaded and instructed me not to take the stand, that the Court would advise the jury to disregard my testimony as uncredible and unreliable, ma'am, as it was . . . inconsistent with prior out of court statements, being that I told the detectives that I was never on the campus, that I didn't know the victim at all, by me alleged as fact, really, as fact that Ms. Resto was the actual killer, I really have no questions to ask Mr. Chipperfield. That's what I said in my motion. . . . Mr. Chipperfield says that he doesn't remember. Being that he doesn't remember doesn't mean it didn't happen. What I alleged in my motion is true[.]

Id. at 148-50. After further discussion with the court regarding whether he wanted to testify as a witness at the evidentiary hearing, Petitioner declined to do so. See id. at 151-53.

The postconviction court denied the claim:

Defendant argues that counsel was ineffective for telling him that if he testified, the Court would instruct the jury "to disregard Defendant's testimony as 'incredible' because it was inconsistent with Defendant's prior out of court statements to law enforcement." On February 15, 2013, the Court conducted an evidentiary hearing on this claim. Counsel testified that he told Defendant the Court would not exclude prior statements but that these statements may raise credibility issues for Defendant and serve as impeachment. Moreover, counsel

testified that he never advised Defendant that the Court would instruct the jury to disregard Defendant's testimony. Counsel testified that he did not remember Defendant ever asking to testify, and he does not remember persuading Defendant not to testify. Finally, counsel testified that the evidence against Defendant was substantial, including witness testimony and DNA evidence.

Defendant neither cross-examined counsel nor testified. Defendant filed a Motion to Appoint Counsel on February 5, 2013, that the Court denied. The Court considered the lack of complexity of Defendant's claim and denied the Motion. Defendant refused to cross-examine [his trial] counsel, insisting that he was unaware of his rights and that the Court must appoint counsel to represent him. The Court denied Defendant's request and then asked Defendant if he would like to cross-examine counsel. Again, Defendant refused. Defendant did state that although counsel did not remember Defendant asking to testify, it did not mean it did not happen. The Court then informed Defendant that he could argue his Motion. Again Defendant refused to testify without counsel and elected his right to remain silent.

. . . Taking Defendant's allegations in his motion as true, the Court finds counsel's testimony to be credible that he did not tell Defendant that the Court would instruct the jury "to disregard Defendant's testimony as 'incredible' because it was inconsistent with Defendant's out of court statements to law enforcement." Defendant is not entitled to relief.

Ex. I at 56-57. Petitioner appealed, and raised one issue: "Trial court abused it's [sic] discretion when it denied Defendant's motion, and multiple oral request[s ] for appointment of 3.850 counsel." Ex. J. at 4 (some capitalization omitted). Petitioner's substantive argument focused on the postconviction court's denial of his requests for counsel. See id. at 4-8. The state responded on the merits, arguing that the postconviction court did not abuse its discretion in denying Petitioner's requests for counsel. Ex. K. The First DCA entered a per

curiam affirmance without issuing a written opinion, Ex. L, and subsequently denied Petitioner's motion for rehearing, Ex. O.

Respondents contend that this claim is procedurally barred, because Petitioner's appellate brief failed to address it; thus, the claim was abandoned on appeal. Florida Rule of Appellate Procedure 9.141 requires a petitioner to file an appellate brief if he received an evidentiary hearing on one or more claims. Fla. R. App. P. 9.141(b)(3)(C) (requiring the filing of an initial brief after the grant or denial of a Rule 3.850 motion if an evidentiary hearing was held on one or more claims). Petitioner filed an appellate brief, but he did not raise this issue. Therefore, this claim was abandoned on appeal. Atwater v. Crosby, 451 F.3d 799, 809-10 (11th Cir. 2006) ("Pursuant to state procedural rules, abandonment of an issue results from submission of a brief without argument thereon in an appeal of an order denying relief after an evidentiary hearing." (citing Shere v. State, 742 So.2d 215, 217 n.6 (Fla. 1999)); see also Cortes v. Gladish, 216 F. App'x 897, 899-900 (11th Cir. 2007) (recognizing that if the petitioner "received an evidentiary hearing, his failure to address issues in his appellate brief would constitute a waiver"). Petitioner cannot now return to state court and properly exhaust this claim; therefore, it is procedurally barred.

Petitioner argues that Florida's appellate rules are ambiguous and "that a ruling in favor of [Petitioner] is required pursuant to the rule of lenity." Reply at 3. The cases cited by Petitioner apply the rule of lenity to criminal statutes. Indeed, Black's Law Dictionary defines the rule of lenity as "[t]he judicial doctrine holding that a court, in construing an ambiguous criminal statute that sets out multiple or inconsistent punishments, should resolve the ambiguity in favor of the more lenient punishment." Black's Law Dictionary (10th ed. 2014).

The rule of lenity does not apply in this circumstance. Additionally, <u>Martinez</u> does not apply to appeals of initial postconviction proceedings. <u>Martinez</u>, 566 U.S. at 16 ("The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings."); <u>see</u> <u>Johnson v. Sec'y</u>, No. 2:12-cv-99-FtM-29DNF, 2014 WL 5177474, at *10 (M.D. Fla. Oct. 14, 2014) (unpublished) ("In the instant case, it is only the appeal of an initial review collateral proceeding that was defaulted. Therefore, the <u>Martinez</u> exception does not apply.").

Petitioner has not shown either cause excusing the default or actual prejudice resulting from the bar. He also has failed to identify any fact that would warrant the application of the fundamental miscarriage of justice exception. Even assuming this claim was not procedurally barred, the claim lacks merit. The record supports a finding that Petitioner's trial counsel was not deficient in the manner argued by Petitioner, and Petitioner has not shown prejudice. Accordingly, he is not entitled to relief on this claim.

**C. Ground 1(C)**

Petitioner argues that his trial counsel was ineffective for failing to move to disqualify the trial judge for two reasons. Second Amended Petition at 14. First, the trial judge was also the judge who issued the search warrant. <u>Id.</u> Second, the trial judge "informed the parties prior to the suppression hearing that his personal friend . . . was one of the first at the scene to see the [victim's] body" and he had told the judge "at length about what he observed that day." <u>Id.</u> (quotations omitted).

At the beginning of the suppression hearing, the following discussion ensued:

> THE COURT: . . . Probably the first issue I need to raise
> - - often when I get these cases we're not really well

acquainted with the facts. . . . A friend of mine - - a personal friend was at the time the principal and was the second person on the scene. . . . I probably should not have let him in retrospect, but he told me at length about what he observed that day. What effect that may have in this case, I don't know since I don't anticipate being the trier of fact. But I do want to make Counsel aware of this because you certainly have the right to move to recuse me if you want. And if you do want to, I will recuse myself.

MR. CHIPPERFIELD: Your Honor, I've just discussed that with Mr. Simmons, and neither one of us wishes to recuse this Court.

There is one other thing too that I discussed with Mr. Mizrahi [(the prosecutor)] before this hearing. That is that the neutral magistrate who issued the search warrant was you. . . . And I don't think that raises - - I don't wish to argue that as a conflict of interest either. We're asking . . . the Court in this motion to throw out the warrant, but it's because of omissions and misrepresentations and not because of any misjudgment by the Court, so - -

THE COURT: I understand that there's no judicial implication in that. The only thing that occurred to me is that I'm sure the State will argue, among other things, that even if those items were thrown out, probable cause still remained. . . . And of course who would be in a better position to know that other than I, so - - I just throw that out for your consideration. Maybe that makes me the perfect judge to hear this or maybe it makes me the last judge to hear this. I don't know.

MR. CHIPPERFIELD: And I'm not sure whether the proper standard for your review would be a neutral magistrate no matter how - - no matter who it was, an objective neutral magistrate. An imaginary neutral magistrate, I guess, is the - - really the standard.

THE COURT: Oh, I think it would be an objective standard rather than a subjective standard, but I don't know. I mean, I'd like to think I would have been objective. . . . I don't know how you separate those.

> MR. CHIPPERFIELD: I agree that the edge of the boundaries of that would blur, but I . . . still don't wish to recuse the Court.
>
> THE COURT: All right. And are you sure that you've had enough time to discuss that with your client? . . .
>
> . . . .
>
> MR. CHIPPERFIELD: . . . If I can take just another minute, I'll talk to him.
>
> THE COURT: Sure.
>
> (Off-the-record discussion).
>
> MR. CHIPPERFIELD: I've discussed it even more thoroughly now with Mr. Simmons, Your Honor, and we don't wish to recuse the Court.

Ex. A at 91-94 (emphasis added). Petitioner was then placed under oath. Id. at 94. The court inquired of Petitioner as to whether he listened to the discussion regarding the judge's friend being a witness and the judge being the same judge who issued the search warrant. Petitioner affirmed that he had and that he did not want the judge to recuse himself. Id. at 94-95. At the conclusion of the suppression hearing, the court denied Petitioner's motion to suppress physical evidence. Id. at 143; see also id. at 40 (denying the motion and finding that "[p]robable cause still existed without alleged misstatements [and] with omissions").

In his initial Rule 3.850 proceeding, Petitioner argued that his counsel was ineffective for failing to move to recuse the trial judge based on the fact that the trial judge was the same judge who issued the search warrant. Ex. I at 32-33. The postconviction court denied the claim:

> Defendant contends that counsel was ineffective for failing to move to disqualify the Judge. Defendant alleges that

26

because the Judge who presided over his trial also signed the search warrant, he had a well-founded fear that he would not receive a fair trial.[]

    . . . Defendant makes speculative, cursory allegations of bias, but has failed to allege any specific instances of prejudice or bias of the Court. Moreover, Defendant has not shown an objectively reasonable fear that he would not receive a fair hearing. Consequently, even if counsel did move to disqualify the Judge, the Court would deny the motion. Defendant fails to satisfy the second prong of <u>Strickland</u> by failing to establish how counsel's omission prejudiced the outcome of the proceedings. Defendant is not entitled to relief.

Ex. I at 57-58 (footnote omitted).[11]

    Petitioner appealed, and raised one issue: "Trial court abused it's [sic] discretion when it denied Defendant's motion, and multiple oral request[s ] for appointment of 3.850 counsel." Ex. J. at 4 (some capitalization omitted). Petitioner's substantive argument focused on the postconviction court's denial of his requests for counsel. <u>See id.</u> at 4-8. The state responded on the merits, arguing that the postconviction court did not abuse its discretion in denying Petitioner's requests for counsel. Ex. K. The First DCA entered a per curiam affirmance without issuing a written opinion, Ex. L, and subsequently denied Petitioner's motion for rehearing, Ex. O.

    Respondents contend that this claim is procedurally barred, because Petitioner's appellate brief failed to address this claim. For the same reasons discussed in Ground 1(B), the Court agrees that this claim is procedurally barred and Petitioner has shown neither

---

[11] The trial judge did not preside over Petitioner's postconviction proceedings.

cause nor prejudice to excuse the bar.[12] He also has not shown that he is entitled to the fundamental miscarriage of justice exception. Even assuming this claim is not procedurally barred, the claim is without merit. Petitioner has failed to show deficient performance or resulting prejudice based on counsel's failure to seek the trial judge's recusal. Petitioner is not entitled to federal habeas relief on ground 1(C).

### D. Ground 2

Petitioner argues that the "trial court err[ed] in finding probable cause for the search warrant when Detective Warkent[ie]n misled the issuing magistrate, either intentionally or through reckless disregard for the truth." Second Amended Petition at 16 (capitalization and emphasis omitted). Respondents assert that this ground is barred by Stone v. Powell, 428 U.S. 465 (1976), and this Court agrees.

> Stone instructs that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. In this context the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force.
>
> For a claim to be fully and fairly considered by the state courts, where there are facts in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state

_____

[12] Petitioner presented this claim in his initial Rule 3.850 proceeding, arguing that his counsel was ineffective for failing to move to recuse the trial judge based on the fact that the trial judge was the same judge who issued the search warrant. Ex. I at 32-33. To the extent Petitioner argues that Martinez should apply to his claim that counsel was ineffective for failing to move to recuse the judge based on the situation with the judge's friend being a witness, the claim lacks merit. Thus, Martinez is inapplicable.

> court. Where, however, the facts are undisputed, and there is
> nothing to be served by ordering a new evidentiary hearing, the
> full and fair consideration requirement is satisfied where the
> state appellate court, presented with an undisputed factual
> record, gives full consideration to defendant's Fourth
> Amendment claims.

Mincey v. Head, 206 F.3d 1106, 1126 (11th Cir. 2000) (citations omitted).

Petitioner filed two motions to suppress in the trial court. Ex. A at 33-35, 37-39. At issue here is the motion to suppress physical evidence, which included DNA swabs and resulting DNA evidence. Id. at 37-39. The trial court held a hearing on the motions, during which it watched a videotaped interview of Petitioner prior to his arrest in this case; received into evidence pertinent portions of Detective Warkentien's deposition, the detective who applied for the search warrant at issue; and heard argument from counsel. Id. at 91-147.[13] On the record, the trial court denied the motion to suppress physical evidence: "I am entering an order denying the motion to suppress physical evidence finding that probable cause still existed without the alleged misstatements and with the omissions in the affidavit." Id. at 143. The judge subsequently entered a written order to that effect. Id. at 40 (citing Thorp v. State, 777 So. 2d 385 (Fla. 2000)). Petitioner, through counsel, raised this claim on direct appeal. Ex. C. The State responded on the merits. Ex. D. The First DCA Appeal per curiam affirmed Petitioner's judgment of conviction without issuing a written opinion. Ex. E.

---

[13] The portion of the hearing specifically relating to the motion to suppress physical evidence is found at pages 138-43.

A review of the record reflects that Petitioner received a full and fair opportunity to present his claim at an evidentiary hearing in the state trial court and he received meaningful appellate review. Thus, Ground 2 is barred by <u>Stone</u> on federal habeas review.[14]

Even assuming Ground Two is not barred by <u>Stone</u>, the Court would review it under AEDPA's deferential standards. Upon review of the record, this Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to federal habeas relief.

Accordingly, it is

**ORDERED**:

1.    The Second Amended Petition (Doc. 22) is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

2.    The Clerk shall enter judgment denying the Second Amended Petition and dismissing this case with prejudice and thereafter close the file.

---

[14] Although the Court is precluded from reviewing Petitioner's Fourth Amendment claim pursuant to <u>Stone</u>, it may review his Sixth Amendment claim based on counsel's alleged ineffectiveness with respect to the suppression issue. <u>See</u> <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 382-83 (1986) ("[W]e reject petitioners' argument that <u>Stone</u>'s restriction on federal habeas review of Fourth Amendment claims should be extended to Sixth Amendment ineffective-assistance-of-counsel claims which are founded primarily on incompetent representation with respect to a Fourth Amendment issue."). This Court rejected Petitioner's ineffective assistance of counsel claim with respect to the motion to suppress in Ground 1(A).

3.    If Petitioner appeals the denial of the Second Amended Petition, the Court denies a certificate of appealability.[15] Because the Court has determined that a certificate of appealability is not warranted, the Clerk of Court shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** in Jacksonville, Florida, this 20th day of February, 2018.

_____
TIMOTHY J. CORRIGAN
United States District Judge

JAX-3 2/13
c:
Quentin Simmons, #129887
Counsel of Record

---

[15] This Court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), "or that the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (quoting Slack, 529 U.S. at 484). "Where a district court has rejected the constitutional claims on the merits, . . . [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack, 529 U.S. at 484. However, "[w]hen the district court denies a habeas petition on procedural grounds . . . a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. After consideration of the record as a whole, the Court denies a certificate of appealability.